CITY OF EL PASO and Public Utility Commission of Texas,

v.

EL PASO ELECTRIC COMPANY.

No. 3–92–038–CV.

Court of Appeals of Texas, Austin.

March 10, 1993.

Rehearing Overruled May 26, 1993.

Norman J. Gordon, Diamond, Rash, Gordon & Jackson, P.C., El Paso, for City of El Paso.

Dan Morales, Atty. Gen., Mary A. Keeney, Asst. Atty. Gen., Austin, for Public Utility Com'n of Texas.

1. *See* 16 Tex.Admin.Code § 23.23(b)(2)–(8) (1981, since amended).

John F. Williams, Clark, Thomas, Winters & Newton, Austin, for El Paso Elec. Co.

Before POWERS, ABOUSSIE and B.A. SMITH, JJ.

POWERS, Justice.

El Paso Electric Company and the City of El Paso sued for judicial review of a final order issued by the Public Utility Commission in a contested case, a "fuel-reconciliation proceeding" initiated by the Company in which the City intervened. *See* Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c, § 69 (West Supp.1993); Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19 (West Supp.1993). In its final judgment, the district court affirmed the agency order in one part and reversed it in another, remanding the case to the Commission. The Commission and the City appeal. *See* APTRA § 20. We will affirm the district-court judgment.

## FUEL–RECONCILIATION PROCEEDINGS

An electric utility is generally entitled to recover through its rates any sums expended for reasonable and necessary operating expenses, including the cost of fuel and fuel-related items. PURA § 39(a). A utility incurs these fuel costs directly when it generates its own electric power; it incurs them indirectly, as an element of the price paid, when the utility buys electric power from another. Although the Company generates its own electric power, it also purchases electric power under a contract with Southwestern Public Service Company.

Before 1983, the Commission calculated an electric utility's operating expenses (and hence the utility's rates) based on actual fuel costs, authorizing the utility to "pass through" automatically to its customers any increases or decreases in such costs.[1] The legislature forbade the practice in 1983.[2] To accommodate the new legisla-

2. PURA § 43(g)(1) provides that "[a] rate or tariff set by the commission shall not authorize a utility to automatically adjust and pass through to its customers changes in fuel or

tion, the Commission promulgated a set of rules known collectively as the "fuel rule." 8 Tex.Reg. 3540 (1983) (16 Tex.Admin.Code § 23(b), since amended).

As a practical matter, the Commission cannot embark upon and decide a new rate case with each variation in fuel prices. The agency therefore adopted, for its ratemaking, the device of a "fixed fuel factor." This factor is the sum of a utility's "known costs" for fuel plus its "reasonably predictable fuel costs." The latter element renders the sum a mere estimate of the utility's fuel costs. Nevertheless, the estimate is fixed for ratemaking purposes as the utility's hypothetical fuel cost; it is used in calculating the utility's total operating expenses and, ultimately, the rates the utility is permitted to charge its customers. 16 Tex.Admin.Code §§ 23.23(b)(2)(B), 23.23(c). Because actual fuel costs may vary from the estimate, after the rates go into effect, the utility may recover through its rates more or less than the net income its rates were designed to produce. Consequently, the fuel rule provides for periodic adjustments or "reconciliations" of the difference between actual fuel costs and the hypothetical cost represented by the fixed-fuel factor. 16 Tex.Admin.Code § 23.23(b)(2)(H). The reconciliation may be part of a general rate case or an independent reconciliation proceeding. *Id.* Depending on the result of the reconciliation, the utility may be required to refund to its customers an over-recovery of fuel costs or it may be permitted to recoup an under-recovery through surcharges to its customers. 16 Tex.Admin.Code §§ 23.23(b)(2)(B), (F), (G).

## PURCHASED–POWER CAPACITY COSTS

Not every fuel-related cost is includable in a utility's fixed-fuel factor; consequently, not every fuel-related cost is recoverable through the reconciliation process. One excludable item is denominated "purchased power capacity costs." The term "capacity costs" refers to one element of

the price charged by a seller of electric power—an element that represents the seller's fixed costs in generating the power. (Another element, denominated "energy charges," represents the seller's variable costs in generating the power—the cost of fuel, for example). A Commission regulation presently excludes from a utility's fixed-fuel factor the capacity-cost element of purchased power "unless the utility demonstrates that such treatment is justified by special circumstances." 16 Tex.Admin.Code § 23.23(b)(2)(B)(ii). The Commission's regulations did not always allow for exceptions when "justified by special circumstances." Before the regulation was adopted, the Commission issued its final order in an earlier contested case under the agency's docket number 6350.

### Docket Number 6350

Docket number 6350 was a general rate case that included a reconciliation proceeding. The Company satisfied the Commission that special considerations justified reconciliation treatment of the capacity costs the Company paid to Southwestern, during the period March 1984 through July 1985, even though such costs would *not* ordinarily be entitled to such treatment. The Commission's final order in docket number 6350 demonstrates that the special considerations were "equitable" in nature: (1) the purchases of power from Southwestern had benefitted the Company's customers; (2) capacity costs were a necessary element of the Southwestern charges; and (3) it would be inequitable to penalize the Company for successfully reducing its customers' bills by purchasing cheaper power from Southwestern. The Commission's decision in this earlier case preceded by about nine months the amendment of the fuel rule to allow expressly for the reconciliation of capacity costs upon a demonstration of "special circumstances"; that is to say, the Commission viewed the equitable considerations as amounting to an *implied* exception to a general rule that capacity costs were non-reconcilable. It appears to

other costs of the utility." The provision was added by Acts 1983, 68th Leg., p. 647, ch. 146,

§ 2, effective August 29, 1983.

us self-evident, therefore, that "equitable" considerations could come within the *express* exception presently made by section 23.23(b)(2)(B)(ii) for "special circumstances." No argument is made to the contrary in the present appeal.

The Commission's final order in docket number 6350 also adopted a part of the examiner's report wherein he stated that he agreed with a witness's view that the capacity costs paid to Southwestern "should be treated as a non-reconcilable expense *prospectively.*" This gives rise to a part of the present controversy.

### Docket Number 8588

The contested case now before us on appeal was conducted under the Commission's docket number 8588. It is not a rate case but rather an independent reconciliation proceeding. In this proceeding, the Company requested reconciliation of $4,202,090 in capacity costs paid to Southwestern between July 31, 1985, and April 25, 1986, a period of about nine months. The period is the interval between the last day of the reconciliation period covered in docket number 6350 (July 31, 1985) and the effective date of the new rates established in that contested case (April 25, 1986). As special circumstances justifying reconciliation of the capacity costs paid in that period, the Company pointed to the Commission's final order in docket number 6350, wherein the agency had declared that capacity costs should be treated as non-reconcilable "prospectively." The word "prospectively" meant, according to the Company, from and after the effective date (April 25, 1986) of the new rates established in docket number 6350. Hence, by force of that order, the Company was entitled to reconciliation of capacity costs paid in the nine-month interval before the new rates became effective.

In its finding of fact 14 in docket number 8588, the Commission rejected the Company's contention, stating simply that the Company had "failed to show special circumstances warranting inclusion" of such capacity costs in the reconciliation. The sole basis for this conclusion is found in a portion of the examiner's report, which the Commission adopted in its final order: The word "prospectively," as used in the final order in docket number 6350, meant from and after July 31, 1985—the end of the reconciliation period covered in docket number 6350—as opposed to the Company's contention that the word meant from and after April 25, 1986, the effective date of the rates set in the Commission's final order in docket 6350.

The Company sued for judicial review of this aspect of the Commission's final order in docket number 8588. The district court reversed the agency order on the ground that it was arbitrary and capricious in failing adequately to explain why the capacity charges were admitted to reconciliation in the one period and denied reconciliation in the next succeeding period. The court remanded the case to the Commission to supply an explanation. In the Commission's only point of error and in the City's first point of error, they complain of this aspect of the district-court judgment.

### Discussion and Holdings

In its final order in the present case, the Commission gave a *single* ground for its decision regarding capacity costs: the Company failed to demonstrate the requisite "special circumstances" because the word "prospectively," as used in the final order adjudicating docket number 6350, meant from and after July 31, 1985. The final order in the present case, excluding capacity costs from reconciliation, must stand or fall on that basis. We are not at liberty to sustain the order on some other basis *we* might imagine as being sufficient for the different treatment in the two cases—for example, an apparent difference in the material factual circumstances as between the two proceedings. We may judge the sufficiency of the Commission's order solely on the basis given by the agency itself for its decision; to do otherwise would constitute an invasion of the agency's province. *Morgan Drive Away, Inc. v. Railroad Comm'n,* 498 S.W.2d 147, 152 (Tex.1973); *Professional Mobile Home Transp. v. Railroad Comm'n,* 733 S.W.2d

892, 904 (Tex.App.—Austin 1987, writ ref'd n.r.e.).

■ We note first that the examiner's purported explanation—that the word "prospectively" meant from and after July 31, 1985—adds nothing to enlighten the Commission's naked conclusion that the Company had failed to demonstrate the necessary special circumstances. Both the conclusion and the purported explanation are equally opaque. The word "prospectively" was ambiguous in context, and nothing in the record before us suggests why the Commission preferred one date over another. We are left ultimately with the stark conclusion that "prospectively" means from and after July 31, 1985, *merely because that is what the examiner in docket number 8588 decided it meant.* Was the Commission legally obliged to supply an actual reason or explanation for its choice of meanings? We believe it was.

We cannot find that the legislature has imposed upon the Commission, by an explicit statutory enactment, a duty to supply an explanation or reason for its action. But such a requirement need not have a statutory origin. It is preeminently a concomitant of a court's duty of judicial review, a duty assigned the trial court and this court in PURA § 69. This statute contemplates meaningful judicial review, not a charade of the real thing; therefore it implies a power to require the Commission to supply any reasons or explanations necessary for the reviewing court to understand the Commission's final order.

> If the administrative action is to be tested by the basis upon which it purports to rest, that must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, *"We must know what a decision means before the duty becomes ours to say whether it is right or wrong."*

*S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (emphasis added) (citations omitted); *see also S.E.C. v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[T]he orderly functioning of the process of review *requires* that the grounds upon which the administrative agency acted be *clearly disclosed* and adequately sustained.") (emphasis added); *see generally* Bernard Schwartz, *Administrative Law* § 7.29, at 429 (2d ed. 1984); Kenneth C. Davis, *Administrative Law Text* § 16.07, at 326 (3d ed. 1972). The requirement of explanations or reasons is frequently imposed when it appears to the reviewing court that an agency has departed from its earlier administrative policy or there exists an apparent inconsistency in agency determinations. Louis Jaffe, *Judicial Control of Administrative Action* 587 (1965); *see, e.g., Atchison, T. & S.F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); *Secretary of Agric. v. United States,* 347 U.S. 645, 653, 74 S.Ct. 826, 831, 98 L.Ed. 1015 (1954). The requirement for explanatory "reasons" should not be confused with a statutory requirement that binds an agency to supply findings of fact in support of its conclusions of law, as in APTRA § 16(b). "Reasons differ from findings in that reasons relate to law, policy, and discretion rather than to facts." Davis, *supra,* at 326. Nevertheless, agencies frequently use findings of fact to explain the conclusions which express their choices in matters of discretion, law, and policy. Schwartz, *supra,* at 428–30.

■ We believe the Supreme Court of Texas, in *Public Utility Commission v. Gulf States Utilities,* 809 S.W.2d 201, 212 (Tex.1991), adopted a requirement that agencies must supply explanations or reasons when these are necessary to an intelligent understanding of their final orders. There, the court reversed a Commission decision because the agency record revealed that the Commission had apparently considered only a *single* factor in taking a particular discretionary action (dividing between a utility and its ratepayers the benefit of proceeds received from the sale of a utility asset). The court noted that numerous *other* factors, including equitable con-

siderations, appeared applicable to the agency's decision in the matter. In reversing the Commission's final order, the court wrote that the agency "ignored" the other, apparently applicable factors, while referring only to the testimony of two witnesses whose conclusions were not explained in the record, and "the Commission did not articulate its reasons for" deciding the issue based on the single factor alone. In its remand, the court refrained from instructing the Commission to consider particular factors and from prohibiting its consideration of other factors, leaving the agency free to choose and "set forth the factors it considers relevant" together with an explanation of "how these factors are evaluated in the present case." *Id.* at 211–12. While the court nominally reversed the agency order for a want of "substantial evidence," it is readily apparent that the court did so only because of the rather peculiar meaning "substantial evidence" bears in Texas administrative law—a meaning that generally incorporates into a single legal precept both arbitrary and capricious agency action under APTRA § 19(e)(6) and a true want of substantial evidence under APTRA § 19(e)(5). *See generally* Kerry McGrath, *Substantial Evidence Review in Texas— Still Insubstantial After All These Years,* 44 Baylor L.Rev. 223 (1992).

We hold, therefore, that the Commission's final order erroneously omitted to supply a necessary explanation for the choice of meaning it assigned to the word "prospectively," producing thereby the inconsistent treatment of capacity costs in the two back-to-back reconciliation periods. As in *Gulf States,* the agency order in docket number 8588 referred only to the statement of an individual (the hearing examiner in docket number 6350) whose naked conclusion was not explained in the record. We agree with the trial court that the failure to supply the necessary explanation was an abuse of discretion under APTRA § 19(e)(6); it is immaterial that under the peculiar Texas view of "substantial evidence" the omission would also amount to a want of "substantial evidence" under APTRA § 19(e)(5).

The City and the Commission raise several arguments to the contrary. They first complain the Company offered no "evidence" of special circumstances. It is clear from the record, however, that the Company was not relying upon evidentiary grounds for its contention that such special circumstances existed in docket number 8588, the case we now review. Rather, the Company was relying upon legal grounds— that the final order in docket number 6350, properly construed, encompassed the nine months for which reconciliation was requested in docket number 8588. Indeed, the Commission in docket number 8588 rejected the claim for reconciliation *on legal grounds,* not evidentiary or factual grounds, by basing the agency ruling on a construction of the previous order, albeit in a manner contrary to that advocated by the Company. We do not understand that the term "special circumstances" means evidentiary grounds exclusively, and no party suggests that it does.

The City and the Commission argue next that the examiner's report in docket number 6350 was "clear" in *affirmatively* and *expressly prohibiting* "prospective recovery of capacity charges," meaning "all capacity charges not placed in issue in that docket." We disagree.

The relevant part of the examiner's report declares: (1) the examiner agreed that capacity costs "should be treated as a nonreconcilable expense prospectively"; (2) however, that would be inequitable (for specified reasons) with respect to "past payments" of such costs; (3) therefore, the examiner recommends that "prior" capacity-cost expenses be included "in the reconciliation balance." These declarations *are* clear on one point—capacity costs paid before July 31, 1985, the end of the reconciliation period in docket number 6350, would be reconcilable expenses under the examiner's recommendation. The declarations are *not* clear in the sense urged by the City and the Commission—that they *affirmatively* and *expressly prohibit* reconciliation of the capacity costs presently in dispute. In fact, the City offers no argument in support of its conclusion that the declarations are "clear" in excluding *these* capaci-

ty costs from reconciliation; the Commission offers only the opaque generality that an administrative agency's interpretation of its order is entitled to judicial deference.

We find in the declarations nothing to suggest that the Commission, by adopting its examiner's report in docket number 6350, prohibited reconciliation of capacity-cost expenses in the period July 31, 1985—April 25, 1986. Indeed, the examiner's declarations reasonably imply in context that capacity costs paid in the period were entitled to the same equitable justification because April 25, 1986, was the date when the examiner's declarations first acquired legal force and effect by the Commission's adoption of them. The terms of the examiner's recommendation do not suggest that the equitable considerations became inoperable on July 31, 1985, or that the expressions "past payments" and "prior" capacity-cost expenses referred to a date other than the effective date of the order in docket number 6350.

The City and the Commission argue that the Company's contention amounts to no more than a complaint of "regulatory lag" during the nine months between the end of the reconciliation period in docket number 6350 and the effective date of the final order in that contested case. And, they properly point out, losses occasioned merely by regulatory lag are not recoverable by a utility. We disagree with the theory. "Regulatory lag" refers to delay in the "decisional process" of a regulatory agency. *Railroad Comm'n v. Lone Star Gas Co.*, 656 S.W.2d 421, 423 (Tex.1983). The Company does not complain of any delay in the "decisional process" in docket number 6350. It complains instead of the apparently arbitrary meaning assigned *in the present case* to the word "prospectively" as that word was adopted in the Commission's final order in docket number 6350. That choice of meaning, and not any delay in the "decisional process," fixed the time period in dispute.

Finally, the City and the Commission argue that the phrase "arbitrary and capricious," recited in the district-court judgment as the basis for reversing the Com-

mission's final order, does not encompass the agency's failure to explain its different treatment of capacity costs as compared to docket number 6350. Hence, they contend, apparently, that the Commission's final order could not be reversed on the ground that it was "arbitrary and capricious." In support of their argument, the City and the Commission cite judicial decisions that *were* decided on arbitrary and capricious grounds on an apparent theory that these exhaust the possibilities and define the limits of arbitrary and capricious action under APTRA § 19(e)(6). *See Lewis v. Metropolitan Sav. and Loan Ass'n*, 550 S.W.2d 11 (Tex.1977); *Railroad Comm'n v. Alamo Express*, 158 Tex. 68, 308 S.W.2d 843 (1958); *Public Util. Comm'n v. South Plains Elec. Coop.*, 635 S.W.2d 954 (Tex. App.—Austin 1982, writ ref'd n.r.e.). We disagree with the theory. In any case, we are obliged to affirm the district-court judgment if it is correct on any legal ground. We have discussed those grounds above.

For the reasons given, we overrule the Commission's only point of error and the City's first point of error.

### OFF–SYSTEM SALES REVENUES

Section 23.23(b)(2)(A) requires that a utility maintain and provide the Commission information showing, among other things, the utility's "off-system sales revenues." These are revenues derived from a utility's sales of excess electric power to other utilities. Under § 23.23(b)(2)(B)(i), the net revenues from these sales may be set off against costs in calculating, for reconciliation purposes, a utility's "known or reasonably predictable fuel costs."

In the reconciliation period of docket number 8588, the case we now review, the Company received from off-system sales a net revenue equal to $3,099,564 above its costs for fuel and fuel-related items. In its final order, the Commission declined to deduct any part of this sum in calculating the Company's known or reasonably predictable fuel costs. The agency noted in its order, however, that in future reconciliation periods the agency would deduct 75

percent of such revenues in calculating known or reasonably predictable fuel costs.[3] In its finding of fact 11, the Commission stated: (1) profits from off-system sales result jointly from the Company's efforts to make such sales and from the availability of electric power generated from facilities paid for, in effect, by the Company's customers; (2) consequently, in future reconciliation periods the Commission would assign 75 percent of the profits to the customers' benefit and 25 percent to the Company's benefit to encourage the Company to continue making such sales; and (3) for the reconciliation period covered in docket number 8588, however, the profits from off-system sales would continue to be excluded from the reconciliation calculations.

In its second point of error, the City argues the Commission erred by not deducting *all* off-system sales revenues from the Company's known and reasonably predictable fuel costs and contends the district court erred in affirming this aspect of the agency order.

### Discussion and Holdings

■ The City argues the Commission was obliged to deduct *all* profits from off-system sales, in calculating the Company's known and reasonably predictable fuel costs, because the agency lacked the power to divide such profits and to assign one part to the Company's benefit and another part to its customers' benefit. The City bases its argument on PURA § 41(c) which defines the "net income" factor used to fix a utility's rates under PURA § 39(a).[4] PURA § 41(c) defines "net income" as "the

*total revenues* of the public utility less all reasonable and necessary expenses as determined by the Commission." (emphasis added). The substance of the City's argument is that the statutory term "total revenues" implies an entirety; hence it is not divisible in an agency proceeding that pertains to ratemaking. We disagree.

In PURA the Commission received from the legislature powers that are broad and flexible:

The commission has the general power to regulate and supervise the business of every public utility within its jurisdiction and to do all things, whether specifically designated in this Act or implied herein, necessary and convenient to the exercise of this power and jurisdiction. [PURA § 16(a)]

The commission is hereby vested with all authority and power ... to insure compliance with the obligations of public utilities in this Act. [PURA § 37]

It shall be the duty of the [commission] to insure that every rate ... shall be just and reasonable. [PURA § 38]

In fixing a reasonable return on invested capital, the [commission] shall consider ... the efficiency of the utility's operations, and the quality of the utility's management. [PURA § 39(b)].

The breadth of discretion implied by these statutory expressions is contradicted absolutely by the straightjacket theory that the City erects upon an implication imputed to the term "total revenues." Granted that some more particular provision in PURA might have denied the Commission discretion to apportion net revenues from off-system sales, expressly or by necessary

---

**3.** No party suggests that the futurity aspect of this part of the agency order should preclude judicial review. We see no reason why it should. *See* Bernard Schwartz, *Administrative Law* § 9.1, at 522–25 (2d ed. 1984).

**4.** In a determination of allowable fuel costs, the original version of the Fuel Rule listed six costs to be considered, plus "other costs associated with generated and purchased power." 8 Tex. Reg. 3540 (1983) (16 Tex.Admin.Code § 23.-23(b)(2)(B), since amended). The rule further instructed that "the commission shall consider revenues and costs from these other activities,

*including off-system sales,* to assure that the ratepayers receive an appropriate *portion* of benefits associated with such revenues." *Id.* (emphasis added). Nothing in PURA or in the Commission's current regulations deals explicitly with the calculation of off-system sales in the reconciliation of fuel costs.

Although the current version of the Fuel Rule does not contain specific reference to off-system sales, the general language has been amended to require consideration of "other costs *and revenues* associated with generated or purchased power." 16 Tex.Admin.Code § 23.23(b)(2)(B)(i) (emphasis added).

implication, we believe the term "total revenues" is not such a provision. We believe, for example, that the legislature did not intend that any implication imputed to the term "total revenues" should deny the Commission discretion to divide such revenues if the division was necessary to insure a rate that is "just and reasonable" or to secure "efficiency" in utility operations and an acceptable "quality" in utility management. And we point out that efficient operations and high-quality management were the Commission's express objectives in choosing to apportion sales revenues in this case.

The City suggests no general principle which prohibits the division and apportionments made in the present case; the City relies solely upon the implication it attributes to the term "total revenues." This implication is not the Commission's interpretation of that expression, for section 23.23(b)(2)(B)(i) of that rule contemplates consideration of other "conditions or events" that bear upon a utility's fuel and fuel-related costs in the reconciliation context. The division and apportionment of future revenues in this case amounts to an agency interpretation of the fuel rule. We see nothing unreasonable or *ultra vires* in that interpretation, and the fuel rule pertains ultimately to a utility's operating *expenses*, not its *revenues*.

We, therefore, overrule the City's contention that the Commission exceeded its power and discretion when it apportioned the off-system sales revenues.

The City contends there was insufficient evidence adduced in the agency proceeding to support a reasonable conclusion that an allocation of a part of the benefit to the Company would provide an incentive to make future sales of a like kind for the ultimate benefit of its customers. The argument refers to that part of the Commission's finding of fact 11 which stated the agency's reason for allocating 25 percent of the profits to the benefit of the Company in the future. The Commission's declaration merely explained why the agency made the allocation; it does not purport to be the declaration of a fact inferred by the agency from evidence adduced in the contested case. *See* Davis, *supra*. We overrule the City's contention.

■ The City contends finally that providing the Company an incentive to make off-system sales was not a relevant statutory factor in establishing reconcilable fuel costs; consequently, the Commission's decision on that basis amounted to an abuse of discretion under *South Plains Electric Cooperative*, 635 S.W.2d at 957. We disagree.

In promulgating the fuel rule, the Commission responded to the legislative prohibition against fuel-adjustment "pass-throughs." It has not been suggested that the fuel rule, based in part upon predicted fuel costs with periodic reconciliations to actual costs, is an unreasonable rule or one out of harmony with PURA. We have held that the rule lay within the Commission's statutory power to enact at its discretion. The rule establishes, at bottom, an arrangement by which a hypothetical cost of fuel may be used to calculate a utility's "reasonable and necessary operating expenses" for purpose of PURA § 39(a), while allowing concurrently for a consideration of some of the stated factors listed in PURA § 39(b) "in addition to other applicable factors." If nothing else, the allocation refers directly to "the efficiency of the utility's operation." In the words of PURA § 39(a), it is at least another "applicable factor." We overrule the City's contention.

For the reasons given, we overrule the City's second point of error.

Finding no error, we affirm the district-court judgment.