# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00777-CV

**City of Port Neches, City of Nederland, City of Groves, and Texas Gas Service Company, Appellants**

**v.**

**Railroad Commission of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT NO. GN403320, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## O P I N I O N

This appeal arises from the district court's affirmance of a final order entered by the Railroad Commission awarding an increase in Texas Gas Service Company's ("TGS's") gas rates for three of the four cities comprising the South Jefferson County Service Area ("SJC service area")—the Cities of Port Neches, Nederland, and Groves.[1] Appellants include the Cities and TGS, a gas utility that is subject to the Gas Utility Regulatory Act. *See* Tex. Util. Code Ann. § 101.003(7) (West Supp. 2005); § 101.006(b) (West 1998). Although the Cities and TGS both challenge the district court's affirmance of the Commission's final order, they take opposing positions. Essentially, the Cities raise two issues arguing that the awarded rate increase was too high, while

---

[1] We refer to these three cities, collectively, as "Cities." The fourth city in the SJC service area is Port Arthur, which did not participate in the proceedings at-issue because it entered a settlement agreement with TGS concerning its gas rates.

TGS raises two contrary issues arguing that the awarded rate increase and rate case expenses were too low. We will affirm in part and reverse and remand in part.

**BACKGROUND**

On November 15, 2002, Southern Union Gas (a predecessor of TGS) requested an annual rate increase of $853,761 for all four cities in the SJC Service Area. This requested increase was based on test-year data ending in March 2002. The test-year data was systemwide, meaning that it was compiled for all four cities in the SJC service area. Southern Union published a public notice of the $853,761 requested rate increase. The notice was posted in a local newspaper of general circulation from November 30 until December 30, 2002. *See id.* §§ 104.102-.103 (West 1998).

Southern Union's Texas division was then bought by ONEOK Corporation. Texas Gas Service (TGS), as a division of ONEOK, took over the operations of the SJC service area beginning in January 2003. TGS continued the negotiations begun by Southern Union regarding the rate increase in the SJC service area.

In March 2003, TGS and the City of Port Arthur entered into a settlement agreement whereby Port Arthur agreed to pay the increased rates requested by TGS in exchange for the inclusion of a "most favored nation" clause in the settlement agreement. This clause provided that if any of the remaining cities in the SJC service area obtained lower rates, Port Arthur would receive the benefit of those rates.

In April 2003, TGS and the remaining cities in the SJC service area—the Cities of Port Neches, Groves, and Nederland—mediated an agreement whereby TGS would file an updated

2

rate request to reflect the costs arising from ONEOK's/TGS's acquisition of Southern Union.[2] The agreement expressly stated that the updated filing would be considered as part of a "hearing in progress," rather than a new request.

Pursuant to the mediated agreement, on June 27, 2003, TGS filed an updated rate request with the Cities based on a systemwide test year ending December 31, 2002. The updated request reflected that TGS could justify an increase of $1,013,007, but would seek an increase of $853,761 from the Cities, which was the original amount of increase sought by Southern Union in November 2002.[3] On appeal, the Cities characterize this updated filing as a "waiver" by TGS of any amount above $853,761. TGS and the Commission, on the other hand, urge that the company's limited request was merely a settlement offer made in attempt to expediently conclude the proceedings and that, rather than having waived the higher amount, TGS preserved its right to later seek the full increase if the Cities refused its $853,761 offer. TGS did not publish a revised public notice when it filed its updated rate request.[4] Each of the Cities denied TGS's requested rate increase in full.

---

[2] Specifically, the agreement directed TGS to file "a supplemental rate package, based on a test year ending December 31, 2002, adjusted for known and measurable changes, and supporting the rates proposed by TGS in its original filing with the Cities of November 15, 2002, or such modifications to those rates as TGS shall then deem appropriate."

[3] In the cover letter attached to its June filing, TGS stated, "Although the supplemental rate filing reflects a deficiency that is [] greater than the original, the Company does not, at this time, seek recovery of the additional deficiency. The proposed tariffs included in this package reflect rates which would result in [the same] increase we originally requested."

[4] The hearing examiners observed in the proposal for decision (PFD) that "the fact that multiple filings were made" has "caused considerable confusion" and raised unique "jurisdictional issues."

On November 12, 2003, TGS appealed the Cities' decision by filing a petition for review with the Commission. *See* Tex. Util. Code Ann. § 103.054 (West 1998). In its petition, TGS sought a rate increase of $1,225,857 from the Commission, which was based on the updated test-year data ending December 31, 2002, adjusted for known and measurable changes. *See id*. § 103.055 (West 1998). In other words, the requested amount sought by TGS in its petition for review was the higher amount set forth in its June 27 updated filing ($1,013,007) plus $212,850 for changes that had occurred since that filing. The Cities intervened in the proceeding, requesting that the Commission decrease TGS's existing rates by $253,057. Following a four-day hearing, the examiners issued a proposal for decision (PFD) on June 15. The Commission adopted most of the examiners' recommendations in its final order, which awarded TGS a rate increase of $887,295.

Following unsuccessful motions for rehearing, both the Cities and TGS sought judicial review of the Commission's final order in district court. *See* Tex. Gov't Code Ann. §§ 2001.171-.178 (West 2000); Tex. Util. Code Ann. § 105.001 (West 1998). The district court affirmed the Commission's order. This appeal followed.

In opposing issues, both the Cities and TGS assert that the district court erred in affirming the Commission's order. Specifically, the Cities argue that (1) the awarded rate increase was in excess of the Commission's jurisdictional limits because the Commission improperly considered the expenses of the Southern Union acquisition as a "known and measurable change," and (2) the rate calculation should have included as a "known and measurable change" the $295,160 worth of increased revenues that TGS would collect from Port Arthur pursuant to the settlement agreement. TGS disagrees with the Cities on both of these issues and asserts in two additional issues

that (1) the rate calculation should *not* have included as "revenues" $44,239 worth of "forfeited discount revenues" that TGS may collect from Port Arthur, and (2) the Commission should have awarded TGS $80,480 in rate case expenses for the cost of a consultant who prepared data and testified for TGS. The Commission responds that all of the Cities' and TGS's issues are without merit and urges that the district court correctly affirmed the Commission's final order. We will consider each of these issues as follows: (1) jurisdictional limits, (2) increased settlement revenues, (3) forfeited discount revenues, and (4) rate case expenses.

## STANDARD OF REVIEW

We review an order of the Railroad Commission in a ratemaking proceeding for substantial evidence. Tex. Gov't Code Ann. § 2001.174 (West 2000); Tex. Util. Code Ann. § 105.001; *Railroad Comm'n v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 75 & n.44 (Tex. 2003); *CenterPoint Energy Entex v. Railroad Comm'n*, No. 03-04-00688-CV, 2006 Tex. App. LEXIS 3518, at *9 (Tex. App.—Austin Apr. 28, 2006, no pet.). Under this standard, we presume that the Commission's findings are supported by substantial evidence, and the contestant bears the burden of proving otherwise. *Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 184 (Tex. App.—Austin 2004, pet. denied). The Commission's order may be reversed only if a party's substantial rights have been prejudiced because the administrative decisions (1) violate a constitutional or statutory provision, (2) exceed the agency's authority, (3) were made through unlawful procedure, (4) are affected by another error of law, (5) are not reasonably supported by substantial evidence when considering the reliable and probative evidence in the record as a whole,

5

or (6) are arbitrary or capricious or characterized by an abuse of discretion. Tex. Gov't Code Ann. § 2001.174.

Although substantial evidence requires more than a scintilla, the evidence may actually preponderate against the Commission's decision, and this Court must still uphold it if enough evidence suggests that the determination was within the bounds of reasonableness, that is, if substantial evidence supports its determination. *Nucor Steel v. Public Util. Comm'n,* 168 S.W.3d 260, 267 (Tex. App.—Austin 2005, no pet.). The test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record to support the agency's action. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Occidental Permian Ltd. v. Railroad Comm'n*, 47 S.W.3d 801, 805 (Tex. App.—Austin 2001, no pet.). Although the record may contain conflicting evidence, credibility is lent to the Commission's ultimate resolution of those conflicts when, as here, "the record, evaluated as a whole, reflects a process of discussion, careful consideration, and compromise." *Pedernales Elec. Coop. v. Public Util. Comm'n*, 809 S.W.2d 332, 341 (Tex. App.—Austin 1991, no writ). We may not substitute our judgment for that of the agency on questions committed to agency discretion. *CenterPoint Energy*, 2006 Tex. App. LEXIS 3518, at *10 (citing *Gulf States Utils. Co. v. Public Util. Comm'n,* 947 S.W.2d 887, 890 (Tex. 1997)).

**ANALYSIS**

**Jurisdictional Limits**

The Cities complain in their first issue that the rate increase awarded in the Commission's final order and affirmed by the district court's judgment should be reversed because it exceeds the jurisdictional limits of the Commission's authority. Specifically, the Cities urge that

6

the appropriate rate increase should have been $728,048, which is $159,247 less than the $887,295 increase awarded by the Commission. The $159,247 represents the expenses incurred by ONEOK/TGS from the acquisition of Southern Union. The Cities contend that these expenses cannot be included as a "known and measurable change." Both the Commission and TGS respond that it was proper to include the $159,247 in the rate calculation and, hence, the awarded rate increase was within the Commission's jurisdictional authority.

The Gas Utilities Regulatory Act (GURA) provides that the Railroad Commission is responsible for the regulation of gas utilities, such as TGS. *See generally* Tex. Util. Code Ann. §§ 102.001-.005 (West 1998 & Supp. 2005). GURA is to be "construed liberally to promote the effectiveness and efficiency of regulation of gas utilities." *See id.* § 101.007 (West 1998); *Centerpoint Energy Entex v. Railroad Comm'n*, No. 03-04-00731-CV, 2006 Tex. App. LEXIS 5882, at *11 (Tex. App.—Austin July 7, 2006, no pet.). The Commission's authority, however, is not without limit. The Commission is a creature of statute and has no powers other than those expressly conferred on it by the legislature or implied as reasonably necessary to fulfill its express functions. *City of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 441 (Tex. 2002); *Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 685 (Tex. 1992).

The rate-setting process for gas utilities within municipal borders begins at the municipal level. Municipalities have exclusive original jurisdiction over the rates, operations, and services of a gas utility within a municipality, subject to GURA's restrictions that the rates be "fair, just, and reasonable." Tex. Util. Code Ann. § 103.001 (West Supp. 2005).[5] To obtain a rate

---

[5] The Railroad Commission has appellate jurisdiction over these rates and original jurisdiction to set rates in unincorporated areas, known as "environs." Tex. Util. Code Ann.

increase, a gas utility must file a request with the municipality (a "statement of intent") and publish

a public notice of that intent for four consecutive weeks in a local newspaper. *Id*. §§ 104.102-.103.

If the gas utility is dissatisfied with the municipality's decision about the rate request, it may appeal

to the Commission. *Id*. § 103.051 (West 1998).

Section 103.055(a) provides that an appeal to the Commission of a requested rate

filing shall be "de novo and based on the test year presented to the municipality adjusted for known

changes that are measurable with reasonable accuracy." *Id*. § 103.055(a) (West 1998). In other

words, the Commission is to determine, based on the information presented to the municipality, what

rate the municipality should have set, and then increase or decrease that amount based on the known

and measurable changes that have occurred since the test-year data was collected. *Id*. Additionally,

the Commission must ensure that the rates are just and reasonable, and not unreasonably preferential,

and that the rates "permit the utility a reasonable opportunity to earn a reasonable return," while not

"yield[ing] more than a fair return." *Id*. §§ 104.003-.004, .051-.052 (West 1998); *CenterPoint*

*Energy*, 2006 Tex. App. LEXIS 3518, at *11.

Here, all parties agree that, pursuant to section 103.055(a), the Commission's proper

method of calculating the necessary rate change on appeal is to start with the total test year presented

to the Cities and then adjust that amount for known and measurable changes. *See* Tex. Util. Code

Ann. § 103.055(a). The dispute about whether the awarded rate increase was excessive turns on a

___

§ 102.001 (West Supp. 2005), § 103.055 (West 1998). Also, a municipality can surrender its authority to the Commission. *Centerpoint Energy Entex v. Railroad Comm'n*, No. 03-04-00731-CV, 2006 Tex. App. LEXIS 5882, at *3 n.3 (Tex. App.—Austin July 7, 2006, no pet.) (citing Tex. Util. Code Ann. §§ 102.001(a)(1)(B), 103.001, 103.003 (West Supp. 2005)).

disagreement about whether the expenses of the acquisition should have been included as a "known and measurable change." *See id*. The Commission has discretion over what adjustments to make for known and measurable changes. *Central Power & Light v. Public Util. Comm'n*, 36 S.W.3d 547, 563 (Tex. App.—Austin 2000, pet. denied). Thus, in reviewing the Commission's order, we presume that there is substantial evidence in the record to support the Commission's calculation of known and measurable changes, but we must determine if its decision was in violation of the statute, in excess of its statutory authority, or was arbitrary and capricious or characterized by an abuse of discretion. *See Reliant Energy*, 153 S.W.3d at 184; *City of El Paso*, 883 S.W.2d at 185.

To understand the parties' arguments, it is necessary to examine and compare their specific calculations. The Cities contend that the rate increase should have been calculated as follows. Begin with $853,761—which is the amount that was originally requested and publicly noticed by Southern Union in November 2002 and was then requested again by TGS in June 2003. Increase that amount by $212,849 for "known and measurable changes" that occurred between TGS's June 2003 updated rate filing and its November 2003 petition for review. This equals $1,066,610, which (according to the Cities) is the total amount that was properly before the Commission. Then, decrease that total by $338,562 to reflect the "cost of service adjustments" made by the Commission. This results in a rate increase of $728,048, which is $159,247 less than the $887,295 increase awarded by the Commission.

The Commission and TGS agree with the Cities that $853,761 was the appropriate starting figure[6] and that an increase of $212,849 was appropriate to account for known and

_____

[6] The Commission acknowledged in its final order that, because TGS never published an updated public notice of a higher amount, the maximum rate increase that the Cities could have

9

measurable changes occurring after June 2003. The Commission and TGS, however, disagree with the Cities about whether an additional increase should be included.

Whereas the Cities seek to limit the increase to changes that occurred *after* TGS's June 2003 filing (*i.e.*, $212,849), the Commission and TGS urge that, in addition to this amount, the starting figure should also be increased by the "known and measurable change" of $159,247 to reflect the expenses associated with ONEOK's/TGS's acquisition of Southern Union. The Commission and TGS contend that these expenses are supported by the data presented in TGS's June 2003 updated filing. They argue that—although TGS voluntarily limited its request to $853,761 at that time and, therefore, did not publish notice of the higher amount—the updated filing presents data from which to calculate with reasonable accuracy an additional $159,247 in known and measurable changes.[7] Therefore, the Commission and TGS urge that the total amount properly before the Commission was $1,225,856 (the sum of $853,761 + $212,849 + $159,247).

The Cities do not contest that TGS incurred expenses of $159,247 from the acquisition or that the June 2003 filing supported these expenses. Rather, the Cities argue that (1) TGS waived the recovery of these expenses by not seeking the full amount ($1,013,007) from the Cities and not publishing an updated public notice of that amount and that, (2) in any event, the Commission is authorized by GURA to consider only the known and measurable changes that arose

___

approved was $853,761—the amount requested in the original November 2002 filing, published in the public notice, and reasserted in the updated June 2003 filing. *See* Tex. Util. Code Ann. §§ 104.102-.103 (West 1998).

[7] It is undisputed that TGS demonstrated in its June 2003 filing that it could justify an increase of $1,013,007, but sought only $853,761—a difference of $159,246. It is unclear why this amount is one-dollar different than the amount discussed by the Cities. For clarity, we will refer to the disputed amount as $159,247.

*after* the rate request was filed with the municipalities; any changes existing at the time the request was before the Cities must be disregarded. We disagree.

The statute expressly entitles the Commission to review the municipal decision *de novo*, as long as the Commission begins with the test year that was presented to the municipality and publicly noticed, and adjusts it "for known changes that are calculable with reasonable accuracy." *See* Tex. Util. Code Ann. §§ 103.055(a), 104.102-.103. The Cities attempt to limit the statute's express grant of *de novo* review by isolating the statute's language that the Commission is to "establish[] the rates . . . the municipality should have set." *See id*. § 103.055(b). On this basis, the Cities urge that the Commission is prohibited from awarding any rate increase greater than the amount presented at the municipal level. This argument is without merit. The statute plainly allows the Commission to award a rate increase greater than the request made at the municipal level because that amount may be adjusted for known and measurable changes, which allows an upward adjustment. *See id*.

Here, it is undisputed that the Commission's proper starting figure was $853,761 (the amount presented to the Cities and publicly noticed) and that an increase of $212,849 was appropriate for expenses arising after June 2003. The record further reflects that TGS incurred additional known and measurable expenses of $159,247 due to the January 2003 acquisition of Southern Union, which occurred after the close of the December 2002 test year that was presented to the Cities. Moreover, by their mediated agreement with TGS, the Cities had expressly directed TGS to update its filing to demonstrate "a supplemental rate package, based on a test year ending December 31, 2002, adjusted for known and measurable changes, and . . . [including] such

11

modifications to those rates as TGS shall then deem appropriate." TGS followed the Cities' directive and submitted an updated filing that reflected additional expenses based on the 2003 acquisition of Southern Union, which occurred after the test year ended, and these expenses were calculable with reasonable accuracy based on the data presented in TGS's updated filing. Nothing in the statute prohibits the Commission from accounting for these expenses as a "known and measurable change" simply because they were known to TGS at the time of its updated request. *See id*. § 103.055. Rather, the supreme court has recognized that, because future rates are set on the basis of past costs, it is necessary to account for changes occurring after the test-year period "to make the test-year data as representative as possible of the cost situation that is apt to prevail in the future." *Suburban Util. Corp. v . Public Util. Comm'n*, 652 S.W.2d 358, 366 (Tex. 1983) (citations omitted).

Also, in *City of Amarillo v. Railroad Commission*, this Court rejected an argument similar to the one asserted by the Cities. 894 S.W.2d 491 (Tex. App.—Austin 1995, writ denied). There, Amarillo argued "that the Commission's appellate jurisdiction is limited to 'fixing such rates that the municipality should have fixed'" and that, based on this limitation, the Commission erred in re-examining Amarillo's award of rate case expenses. *Id*. at 494. This Court disagreed, holding that Amarillo's interpretation "violates fundamental tenants of statutory construction" and that the Commission's "broad grant of jurisdiction to review all municipality orders, coupled with its authority to conduct appeals de novo" permitted the Commission to re-examine and re-formulate Amarillo's rate calculation. *Id*. at 494-95. The Commission was not bound to treat the disputed expenses in the same manner as Amarillo had. *Id*. at 495 n.1.

12

Finally, the fact that TGS initially chose to limit its rate request to $853,761 does not mean that it waived recovery of the additional $159,247 as a "known and measurable change." TGS's Director of Financial and Regulatory Analysis, Stacey McTaggart, testified that TGS "limited its [June 2003] request to the original amount as a show of good faith in order to settle the case. [TGS] sincerely desired to settle the case at the city level and tried to demonstrate that desire to the Cities by not increasing the amount of the requested increase." In the cover letter attached to its updated filing, TGS stated that it did not seek the additional increase "at this time," indicating that it reserved the right to do so at a later date. TGS was entitled to seek a lower amount in attempt to settle the negotiations expeditiously, while still presenting data to support the expenses it had incurred since its November 2002 filing based on the transfer of ownership from Southern Union to ONEOK/TGS. We decline to adopt a rule that would discourage settlement offers by utilities.

We conclude that the Commission properly included the $159,247 incurred as a result of ONEOK's/TGS's acquisition of Southern Union as a "known and measurable change." The resulting total rate increase was, therefore, not in excess of the Commission's statutory authority.[8] Rather, this portion of the Commission's order was supported by substantial evidence and the district court did not err in affirming it. The Cities' first issue is overruled.

---

[8] Alternatively, the Cities' argument that the awarded increase of $887,295 exceeded the Commission's jurisdictional limits is without merit because the Cities acknowledge that the Commission was authorized to consider a total increase of $1,066,610 (*i.e.*, the originally requested and publicly noticed $853,761, plus known and measurable changes of $212,849). The Cities' argument presumes that the $338,562 reduction to that amount made by the Commission somehow limited the Commission's jurisdictional authority. This presumption is unfounded. Having recognized that the Commission could properly consider an increase of over a million dollars, the Cities cannot now claim that the Commission's award of $887,295 exceeded its authority.

13

**Increased Settlement Revenues**

In their second issue, the Cities argue that the rate increase awarded by the Commission and affirmed by the district court was excessive because the Commission failed to account for increased revenues that TGS would receive from its settlement with Port Arthur. Both the Commission and TGS respond that these revenues were properly excluded from the rate calculation. Again, we review the Commission's rate calculation decisions for substantial evidence.[9]

Pursuant to the settlement agreement entered into by TGS and Port Arthur in March 2003, TGS planned to collect approximately $295,160 in additional revenues from Port Arthur. In its final order, the Commission found that adjusting the rates "by adding [the increased settlement] revenues from Port Arthur will result in an under recovery by TGS and is not reasonable." The Cities argue that, because TGS would collect these increased revenues from Port Arthur, a city within the SJC service area, the increased revenues must be acknowledged as a known and measurable change; *i.e.*, an increase to TGS's income. Further, the Cities assert that it is inequitable to not credit the increased Port Arthur revenues against TGS's revenue requirement because, by

---

[9] As an initial matter, because the second and third issues on appeal involve complex rate-setting calculations, it is helpful to understand the components of the Commission's rate-setting formula. Although more simply stated in the first issue as "test year adjusted for known and measurable changes," the formula is specifically as follows: Total rate change necessary = (revenue requirement) – (total adjusted revenues). The revenue requirement is calculated by adding the utility's "return on investment" (its rate of return multiplied by its reasonable and prudent capital investment) to its "reasonable and necessary operating expenses" (the test-year expenses adjusted for known and measurable changes). The total adjusted revenues are calculated by adjusting the test-year revenues for known and measurable changes. *See* Tex. Util. Code Ann. §§ 104.053-.058 (West 1998).

14

filing a rate request based on systemwide costs, TGS received the benefit of the Port Arthur expenses. We disagree.

The Commission's decision to not include the Port Arthur settlement revenues as a known and measurable change was within its discretion and was supported by substantial evidence. *See Central Power & Light*, 36 S.W.3d at 563 (Commission has discretion over what adjustments to make for known and measurable changes). We reject the Cities' attempt to distinguish *Central Power & Light* on the basis that it involved the Public Utility Commission rather than the Railroad Commission because the Cities acknowledge in their reply brief that "the Commission has the sole discretion to determine what constitutes a known and measurable change." The Cities' disagreement, therefore, is not whether the Commission has such discretion, but instead concerns the Commission's exercise of that discretion in this case. The Cities argue that, because "there can be no question that the . . . Port Arthur settlement [revenues] w[ere] a known and measurable change of $295,160," the Commission had no choice but to include them. This argument is without merit because the collection of that amount was speculative.

The collection of these revenues was subject to the "most favored nations clause" included in the Port Arthur settlement, which stated that, if any of the three remaining SJC service area cities obtained lower rates, Port Arthur's rates would be reduced accordingly. Thus, at the time of the Commission's order, the $295,160 reflected only projected revenues that had not yet been fully collected and were subject to change. Due to the speculative nature of the Port Arthur settlement revenues, it would have been unreasonable for the Commission to include them as a "known and measurable change."

15

Furthermore, there was no inequity in setting the three Cities' rates based on systemwide costs, yet exclusive of the increased Port Arthur settlement revenues, because the test-year data upon which the rates were calculated accounted for both the expenses and revenues of the entire SJC service area. The legislature has determined that the most efficient method of setting rates is to compile data from a historical test year, adjust it for known changes, and then use those figures to project rates for the future. Tex. Util. Code Ann. § 101.003(16) (West Supp. 2005), §§ 103.055(a), .056 (West 1998); *see also Centerpoint Energy*, 2006 Tex. App. LEXIS 5882, at *16. It is common practice for the test-year data to be collected systemwide rather than on an individual-city basis because the system operates in an integrated fashion. *See City of Corpus Christi v. Public Utility Comm'n*, 572 S.W.2d 290, 295 (Tex. 1978) ("realit[y] in this state is the existence of large integrated utilities, the facilities of which serve many communities without regard to governmental boundaries"). The examiners stated in the PFD that, because the "SJC service area is operated as a single integrated service area, it is not possible to separately identify all of the plant and expenses associated with the three cities." This conclusion was supported by the testimony of Stacey McTaggart, TGS's Director of Financial and Regulatory Analysis, who explained that the systemwide approach "is the normal and ordinary way that rates are set when one portion of a service area has implemented a revenue increase and another portion has not," such as in "environs cases."

Additionally, F. Jay Cummins, a senior consultant with R.J. Covington Consulting, testified on behalf of TGS that it would be "erroneous" to "adjust rates downward" for the increased settlement revenues because they do "not involve billing determinate changes" and "Port Arthur's action has no impact on the rate setting process in this proceeding." Cummins provided detailed

16

calculations demonstrating why it would create a revenue deficiency for TGS if the increased settlement revenues were included in the total adjusted revenue calculation.[10] Also, McTaggart testified that, if the increased settlement revenues were included in the calculation, it would "incorrectly spread[] to the Cities a benefit from the increase paid by customers in Port Arthur," thereby "reduc[ing] the revenue requirement of the Cities without making any concomitant changes to the billing determinants used to set rates in this case." Accordingly, substantial evidence existed to support the Commission's finding that, because the test-year data upon which the rates were calculated already included Port Arthur revenues, the Cities' position—of also including the Port Arthur settlement revenues—would double-count revenues for Port Arthur and would result in an under-recovery to TGS.

Finally, the issue presented here is similar to one previously decided by this Court in *City of El Paso v. El Paso Electric Co.*, 851 S.W.2d 896 (Tex. App.—Austin 1993, writ denied). There, the Commission declined to include in its rate calculation the revenues received by the utility from "off-system sales." *Id*. at 902. El Paso argued that such revenues should have been credited against the utility's "known and reasonably predictable" costs. *Id*. at 903. Noting that the Commission is given broad discretion over how to calculate revenues, this Court held that the Commission's decision to not include "off-system sale revenues" was reasonable and affirmed that portion of the district court's judgment upholding the order. *Id*. at 903-04.

---

[10] In sum, because the "necessary rate change" is calculated by subtracting "total adjusted revenues" (test-year revenues adjusted for known and measurable changes) from the "approved revenue requirement" (test-year expenses adjusted for known and measurable changes, plus return on investment) the Cities' proposed credit to the amount of revenues would have the overall affect of lowering the awarded rate increase, thereby creating a revenue shortfall for TGS.

Because the increased settlement revenues from Port Arthur were speculative and were outside the scope of the test year, we conclude that the Commission's decision to exclude them from its rate calculation was not arbitrary and capricious nor characterized by an abuse of discretion. The Cities' second issue is overruled.

Having overruled both of the Cities' issues, we now address the two issues raised by TGS.

**Forfeited Discount Revenues**

As part of its initially proposed rate design, TGS had included a "prompt payment provision" on residential, commercial, and public authority tariffs. Pursuant to this provision, a five-percent penalty would be added to any bill not paid within fifteen days of its issuance. The revenues that would result from such payments are referred to as "forfeited discount revenues, (FDRs)," because they are incurred by customers who "forfeit the discount" by not paying their bill within the initial fifteen days. The Commission found in its final order that the prompt payment provision was an improper penalty disallowed by the Commission's "quality of service rules." *See* 16 Tex. Admin. Code § 7.45 (2004). The Commission, therefore, eliminated the provision, which in turn eliminated TGS's ability to recover the FDRs. The Commission's order, however, applied only to the revenues collected in Port Neches, Nederland, and Groves because Port Arthur had agreed to pay higher rates pursuant to the separate settlement agreement. The prompt payment provision and resulting FDRs were part of the settled rate established between Port Arthur and TGS, which had not been appealed to the Commission. Therefore, in Port Arthur, TGS continued to enforce the prompt payment provision and collect the resulting FDRs. In its rate calculation, the Commission eliminated the

18

FDRs relating to the Cities, but maintained the Port Arthur FDRs as a revenue credit. In its first issue, TGS complains about this decision, urging that it resulted in an under-recovery of rates.

As indicated in TGS's original application, the total systemwide amount to be collected from the FDRs was $180,492, which was included in TGS's calculation of total revenues. The Commission allocated these revenues according to the percentage of the system comprised by Port Arthur (57%) versus the three remaining cities, collectively (43%). Thus, the FDRs were respectively allocated as $102,880 for Port Arthur and $77,612 for the Cities. To account for the elimination of the prompt payment provision, the Commission deducted $77,612 from TGS's overall adjusted revenues, thereby excluding from its calculation the estimated FDRs that would have been collected in Port Neches, Nederland, and Groves. The Commission, however, maintained in its revenue calculation the $102,880 of FDR revenues that TGS would collect from Port Arthur pursuant to the settlement. Because this credit was applied in setting the rates for the three remaining Cities, which comprise 43% of the system, the amount of Port Arthur FDRs included as a revenue credit was $44,239 (43% of $102,880).

TGS does not challenge the Commission's elimination of the prompt payment provision as an improper penalty relating to the Cities. TGS argues, however, that the Commission should have eliminated all of the FDRs, including the Port Arthur amounts, from its calculation. Specifically, as urged by TGS in its motion for rehearing before the Commission, "[t]he proper way to treat the forfeited discount revenues in this case is to subtract all of them from the 'other revenues' and proceed to set base rates on the basis of the new (higher) number," which would eliminate the $44,239 "subsidy." According to TGS, it was error for the Commission to credit the Port Arthur

19

FDRs against TGS's revenue requirement because those rates were imposed and those revenues werecollected pursuant to a separate settlement agreement that was not before the Commission on appeal.

Both the Commission and the Cities respond that the Port Arthur FDRs were properly included in the rate calculation as a revenue credit because TGS invited that result by filing a rate request based on a systemwide test year. We do not find merit in this argument. As previously discussed, the historical test-year data was presented based on systemwide costs and revenues for an integrated system. This data accounted for the revenues collected from Port Arthur in that test year. It would double-count such revenues to credit to the Cities an additional amount for the Port Arthur FDRs that were being paid only by Port Arthur pursuant to a separate settlement agreement. Stated another way, under the Commission's order, the Cities' rates were offset by revenues that would never be collected from the Cities, but were instead being paid by Port Arthur, which resulted in a deficiency to TGS of $44,239.

We agree with TGS that this portion of the Commission's order violates the Commission's statutory authority. Just as the Commission properly excluded the increased Port Arthur settlement revenues in its rate calculation because they were outside the scope of the test year and would result in under-recovery to TGS,[11] the Commission should have excluded the Port Arthur FDRs from its rate calculation. We have not been cited to any testimony or documentary evidence in the record, nor has our independent review of the record revealed any such evidence, that was presented to the Commission in support of crediting the Port Arthur FDRs as an offset against the

---

[11] *See* discussion *infra* regarding "Increased Settlement Revenues."

20

revenue requirement. Apparently, no witness testified about how this calculation should be performed or the legal basis behind it.

Therefore, we conclude that the Commission's treatment of the Port Arthur FDRs as a credit against the revenue requirement was not supported by substantial evidence in the record and was in violation of the Commission's statutory authority. This portion of the Commission's order prejudiced the substantial rights of TGS by causing an under-recovery of its rates. *See* Tex. Gov't Code Ann. § 2001.174. We sustain TGS's first issue.

## Rate Case Expenses

In its second issue, TGS argues that the district court erred by affirming the portion of the Commission's order that disallowed TGS recovery of certain rate cases expenses—namely, those incurred by hiring June Dively of Dively & Associates as a consultant to analyze data and present testimony about her analysis.

TGS sought recovery of $812,324.47 in rate case expenses, $80,480 of which was for the fees paid to Dively. Although the Commission approved TGS's recovery of $665,010.75 in rate case expenses,[12] the Commission found that recovery of the remainder was not reasonable. Specifically, the Commission determined that TGS could not recover its expenses for Dively because she "was retained to ascertain the effects of the merger between ONEOK and [Southern Union]."

---

[12] The Commission allocated $530,690.75 of these to "actual work performed" and $134,320 for "estimated future rate case expenses." These allowable expenses were to be collected as a surcharge on rates over a 60-month period.

TGS argues that the Commission's refusal to grant TGS recovery of the expenses associated with Dively's work was arbitrary, erroneous, and not supported by substantial evidence. We disagree.

The Commission has broad discretion to determine recovery of expenses in a ratemaking proceeding. *City of El Paso v. Public Util. Comm'n*, 916 S.W.2d 515, 522 (Tex. App.—Austin 1995), *appeal dism'd by agr.*, 1996 Tex. App. LEXIS 1010 (Tex. App.—Austin Mar. 13, 1996). GURA section 104.055 addresses this authority and permits the Commission to adopt rules for "including and excluding certain expenses in computing the rates." Tex. Util. Code Ann. § 104.055(d), (e) (West 1998); *see also id.* § 104.057 (additional limitations on allowable expenses). The Commission has adopted such rules in the administrative code. Section 7.5530 provides that a party seeking to recover rate case expenses in any rate proceeding must prove by a preponderance of the evidence that the expenses are reasonable. 16 Tex. Admin. Code § 7.5530(a) (2002). This includes the recovery of expenses for professional services, such as consulting. *Id*. The Commission must "consider all relevant factors" in determining whether to allow recovery of the expenses, including whether the work or testimony was duplicative of others and whether the work was relevant and reasonably necessary to the proceeding. *Id.* § 7.5530(b).

Moreover, regarding the evidence presented about the reasonableness and necessity of a rate case expense, the agency is the sole judge of the weight of the evidence and the credibility of the witnesses. *City of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 695 (Tex. App.—Austin 2005, pet. filed). Even still, the Commission may not disregard undisputed facts or testimony unless the record contains "some explanation or reason upon which the reasonableness of their action might be judged." *Cities of Port Arthur, Port Neches, Nederland, & Groves v.*

*Railroad Comm'n*, 886 S.W.2d 266, 271 (Tex. App.—Austin 1994, no writ) (reversing Commission's conclusion that Cities could recover expenses for only 263 hours of attorneys' work because Commission provided no explanation for disregarding undisputed affidavit that 522.76 hours of work had been performed). This explanation or reason need not appear in the final order, however; it is sufficient if contained elsewhere in the record, such as in the PFD. *Id*. at 273 (because Commission's finding of fact made apparent that it adopted examiners' reasoning, explanation set forth in PFD demonstrated reasonable basis for Commission's action); *see also CenterPoint Energy*, 2006 Tex. App. LEXIS 3518, at \*19-20 (reversing Commission's "implicit rejection of [] uncontroverted testimony" because no basis or explanation for action was provided in final order, PFD, or other evidence); *City of Amarillo*, 894 S.W.2d at 496 & n.4 (reading final order and PFD collectively, reasonable basis for Commission's refusal to allow recovery of rate case expenses for consultant's fees was apparent from record).

Here, the Commission disallowed recovery of Dively's fees, despite the essentially undisputed[13] testimony of J. Kay Trostle, an Austin attorney, who testified on behalf of TGS that the requested expenses for Dively's work were reasonable and necessary. She noted, in fact, that Dively charged only $80 per hour, which Trostle characterized as being a low rate for a utility consultant.

---

[13] Although the Cities presented testimony from Daniel J. Lawton, a consultant with Diversified Utility Consultants, Inc., about the unreasonableness of TGS's requested rate case expenses, his comments do not specifically address why recovery of Dively's fees should be denied. Lawton testified only that "TGS appears to have not properly managed its outside lawyers and consultants in this case, resulting in excessive charges." Lawton's complaint was confined to the number of attorneys hired by TGS, without addressing the reasonableness of the consultants' fees.

Dively's affidavit, with copies of her invoices demonstrating that her fees were $80,480.00, was attached in support of Trostle's testimony.

There is, however, a reasonable basis in the record to support the Commission's rejection of Trostle's testimony. In finding that Dively's fees did not constitute a reasonable rate case expense, the Commission adopted the reasoning of the hearing examiners as set forth in the PFD. The examiners stated that "the rate case expenses incurred as a result of the ONEOK acquisition should not be borne by the ratepayers and are not recoverable under § 7.5530." *See* 16 Tex. Admin. Code § 7.5530(a). The examiners' recommendation was based on their conclusion that

> the evidence and testimony in this case indicate that the work that was done by Ms. Dively was needed primarily as a result of ONEOK's acquisition of TGS [sic[14]]. The testimony indicates that she spent a considerable amount of time ascertaining the appropriate allocation amounts as a result of the ONEOK acquisition of TGS. The evidence indicates that Ms. Dively's work was necessary as a result of the ONEOK acquisition and not independently required in order to pursue this rate proceeding. Therefore, the examiners recommend the Commission reduce TGS's reimbursable rate case expenses by $80,480.00.

A review of Dively's testimony, both on direct and rebuttal, confirms the examiners' statements.

The examiners further explained that "a substantial portion of the rate case expenses were incurred as a direct result of the confusion from the utility's [multiple] filings." The examiners concluded that, because TGS brought this confusion on itself by changing its method of calculation

---

[14] ONEOK acquired Southern Union; TGS, as a division of ONEOK, then took over the Southern Union operations in Texas.

from one filing to the next, it provided "another basis for denying certain rate case expenses as discussed above."[15]

Because the action ultimately taken by the Commission was supported by a thorough and accurate explanation in the PFD, which was supported by testimony in the record, we conclude that the Commission's disallowance of TGS's recovery for Dively's fees was supported by substantial evidence.

Beyond this, however, TGS raises an additional argument meriting our attention. TGS contends that it is permitted by GURA to recover as an expense a "payment to an affiliate" if it demonstrates that the payment was reasonable and necessary. *See* Tex. Util. Code Ann. § 104.055(b). TGS considers the costs associated with the acquisition of Southern Union by ONEOK (TGS's corporate parent) to be a "payment to an affiliate." Because Dively's testimony was used to establish the reasonableness and necessity of allocating these acquisition costs, TGS claims that Dively's work was "statutorily required," thereby making the costs associated with her work recoverable.

TGS, however, makes a subtle, yet impermissible leap in this argument. Just because the ONEOK acquisition costs may qualify as an "expense or cost of service" under section 104.055(b) does not automatically entitle TGS to recover, as a "rate case expense" the fees of a

---

[15] The examiners noted that "even the nomenclature . . . used to describe the different elements of the revenue calculation changed" in between filings, which required a "cumbersome analysis," wherein TGS spent "considerable time adjusting the numbers to compare 'apples to apples.'"

consultant used to sponsor the reasonableness and necessity of that "expense or cost of service." *See id.* There is a difference between the "expenses," contemplated by section 104.055, which must be "caused by utility service" to be included in the rate calculation, and "rate case expenses," which are incurred in the administrative process of presenting one's rate case and are recovered through a surcharge. *See id.*; 16 Tex. Admin. Code § 7.5530. It is true that, in order to include the acquisition costs as an "expense or cost of service" in TGS's rate calculation, TGS was required to demonstrate that those costs were reasonable and necessary. But the leap cannot be made from this fact to TGS's conclusion that any fee incurred by TGS in presenting its "cost of service" argument is automatically recoverable as a rate case expense. This is where the Commission's discretion, as discussed above, plays an integral role. Pursuant to section 7.5530, the Commission must consider all relevant factors and determine whether the rate case expense was reasonable and necessary to the proceeding. 16 Tex. Admin. Code § 7.5530.

TGS responds that the Commission's refusal to allow recovery of Dively's fees is, on its face, arbitrary because the Commission adopted an excerpt of Dively's testimony in its final order, finding that the costs about which she testified should be included in the rate calculation. We disagree. Even if the Commission was persuaded by a portion of Dively's testimony, this does not, as a matter of law, entitle TGS to recover the cost of her fees. Especially considering that the Commission awarded TGS $665,010.75 (82%) of its requested rate case expenses, we cannot say that the Commission's disallowance of the recovery of Dively's fees as a rate case expense prejudiced TGS's substantial rights. *See* Tex. Gov't Code Ann. § 2001.174. Moreover, even if we

26

may have reached a different conclusion, we may not substitute our judgment for that of the Commission on a matter such as this, which is committed to the Commission's discretion. *See Gulf States Utils. Co.,* 947 S.W.2d at 890; *City of El Paso*, 916 S.W.2d at 522.

We conclude that the Commission acted within its discretion in adopting the examiner's reasoning and in finding that the consultant fees were not recoverable because Dively's work "was necessary as a result of the ONEOK acquisition and not independently required in order to pursue this rate proceeding" and because many of TGS's rate case expenses were unreasonably incurred due to the confusion TGS created by its multiple, readjusted filings. TGS's second issue is overruled.

**CONCLUSION**

We hold that the district court did not err in affirming the Commission's order in regards to the following decisions: (1) the Commission had statutory authority to include as a "known and measurable change" in the rate calculation the $159,247 in expenses associated with ONEOK's/TGS's acquisition of Southern Union; (2) the increased Port Arthur settlement revenues were properly excluded from consideration in the rate calculation; and (3) Dively's consulting fees incurred by TGS were properly rejected as a recoverable rate case expense. However, the district court erred in affirming the portion of the Commission's order that included $44,239 of forfeited discount revenues as a credit in the rate calculation.

Accordingly, the district court's judgment is affirmed in all parts except for its affirmance of the Commission's treatment of the forfeited discount revenues. That portion of the

27

judgment is reversed and remanded to the district court, with instructions to remand the cause to the Commission for further proceedings consistent with this opinion.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed in Part; Reversed and Remanded in Part

Filed:   August 4, 2006